Other errors assigned are found to be nonprejudicial.

The judgment of the Court of Common Pleas is reversed and final judgment is entered for defendant Pitz, and the cause is remanded to the Court of Common Pleas for execution for costs.

*Judgment reversed.*

NICHOLS and GRIFFITH, JJ., concur.

FESS, J., of the Sixth Appellate District, and NICHOLS and GRIFFITH, JJ., of the Seventh Appellate District, sitting by designation in the Second Appellate District.

GAYNIER ET AL., APPELLANTS, *v.* OHIO FUEL GAS CO., APPELLEE, ET AL.

(No. 4899—Decided May 28, 1956.)

*Messrs. Ritter, Boesel, Holden & Jones* and *Mr. Charles J. Smith,* for appellants.

*Messrs. Hayward & O'Connor,* for appellees.

DEEDS, J. This is an appeal on questions of law from a judgment of the Court of Common Pleas, entered following the verdict of a jury, directed by the trial court at the close of plaintiffs' case in that court.

The plaintiffs, appellants herein, Harley J. Gaynier and Flossie Gaynier, will be referred to herein as the plaintiffs, and the defendant, appellee herein, Ohio Fuel Gas Company, will be referred to herein as the defendant, as the parties involved in this appeal appeared in the trial court.

The action was commenced by the plaintiffs and two insurance companies against the defendant and The Ruch Construction Company and William Keim, a plumber, seeking damages resulting from an explosion claimed due to the negligence of the defendants.

The determination of this appeal, for reasons not pertinent in this review, involves only the two plaintiffs and the defendant gas company, as indicated above.

The allegations of the petition pertinent in a consideration of this appeal are, in substance, that plaintiffs were, on October 1, 1949, and for some time prior to that date, the owners of a certain residence property located at 3758 Beechway Boulevard in the city of Toledo, and that the defendant is a public utility corporation engaged in the sale and distribution of gas for residential and other uses in the city of Toledo.

The plaintiffs allege further in their petition that:

"Article XVIII of the Municipal Code of the City of Toledo, Ohio, provides as follows:

" 'Section 10-18-2. Inspection.

" 'No person shall use or permit the use of a new system or an extension of an old system of gas piping in a building or structure before the same has been inspected and tested to insure the tightness of the system, and a certificate has been issued by the building official.

" 'Section 10-18-3. Certificate.

" 'The building official shall, within a reasonable time after being requested to do so, inspect and test or cause to be inspected and tested a system of gas piping that is ready for such inspection and test, and if the work is found satisfactory and the test requirements are compiled with, he shall issue a certificate to that effect.

" 'Section 10-18-4. Supplying Gas.

" 'It shall be unlawful to supply gas to a system of gas piping in a building or structure before the required certificate has been issued.' "

Plaintiffs allege that the defendant was guilty of specific acts and omissions constituting negligence, resulting in damage to plaintiffs as follows:

"1. That the said defendant negligently and carelessly failed to make a proper and adequate inspection and test of said plumbing installation before supplying gas thereto.

"2. That said defendant, Ohio Fuel Gas Company, negligently and carelessly connected said plumbing system to its gas mains in such manner that gas was allowed to leak from said plumbing system into said residence.

"3. That said defendant, Ohio Fuel Gas Company, negligently and carelessly supplied gas to said system of gas plumbing before an adequate inspection and test was made of said system, and before a certificate was issued by the city of Toledo, in violation of Section 10-18-2 and Section 10-18-4 of the Toledo Municipal Code set forth above."

Defendant admits by its answer that it was a public utility corporation engaged in the sale and distribution of gas for residential and other purposes and denies that it was negligent in any of the respects claimed or in any manner whatsoever.

It is deemed appropriate to note here that the provisions of the municipal ordinance referred to and quoted above were admitted in evidence at the trial of the case pursuant to stipulation between counsel and that they were in effect on the date of the explosion and fire involving plaintiffs' residence, which occurred on October 1, 1949.

The evidence in the record discloses that the construction of the residence of the plaintiffs was almost completed on July 21, 1949, and that on that date plaintiffs commenced their occupancy of the residence; that the residence comprised and consisted of five rooms without basement but with a utility room and attic, which attic was equipped with what was referred to as two casement windows; and that on October 1, 1949, the residence was complete with furnishings for living purposes, including gas appliances and with the gas water heater being maintained by the plaintiffs in the attic of the residence.

The evidence in the record discloses further that the walls of the residence consisted of cinder cement block with a separate outer facing of stone and that an open space of varying

width was maintained and existed between the cinder cement block and the outer stone facing from the foundation of the residence to the attic; that during all the time while the weather was mild and warm, from July 21, 1949, the date upon which plaintiffs commenced their occupancy of the premises, the windows of the attic remained open; and that on the first or second day preceding October 1, 1949, by reason of a change to colder weather, the windows of the attic were closed by the plaintiffs.

It appears from the evidence that at about one o'clock in the afternoon of Saturday, October 1, 1949, a violent gas explosion, followed by a fire, occurred, which resulted in the fire department being called, the extinguishment of the fire by the members of that department, and an investigation by an officer of the department having authority in reference to the origin and cause of the explosion and resulting fire.

It is believed, therefore, to be pertinent here to quote a relevant part of the testimony of the deputy chief of the fire department, whose duty it was to make an investigation and report of the explosion and fire:

"We made a rather extended investigation of all the equipment in the place to try and determine what the equipment might be that could have liberated sufficient gas to cause an explosion of that type.

"The furnace gave no appearance of having any fault whatsoever. Subsequently we came upon the gas heater in the attic and it too did not show any signs of any apparent fault; but the gas company, as I said, after making a check and tests found that there was a distinct opening in the service line.

"Q. By the service line do you mean the line that leads from the street into the house? A. Yes, sir, that is what we refer to as the service line. It is from the curb shut-off cock into the premises.

"Q. Were you there when that leak was discovered, Chief Ringger? A. May I qualify that in this respect: I didn't discover the leak; we discovered phases of the leak. The fact that it would not hold pressure was a clear indication of a leak, but we did not discover the leak.

"Q. It was not checked by you? A. No, sir, the gas company's test, which I had seen several, all indicated clearly that

there was a rupture somewheres in there; that pressure would not maintain. In fact they could not even build up a pressure.

"Q. You stated, Chief Ringger, that this was a gas explosion? A. I assumed it to be a gas explosion.

"Q. After having made your investigation or attendant investigation that was made, what was your conclusion then? A. May I read what I said?

"Q. Yes, if it is all right with the court.

"The Court: If there is no objection. If they do not object we will proceed and if they do I will rule on the objection, one way or the other.

"* * *

"The Court: You may ask him to read it, if you want. There is no objection.

"A. I have said here: 'Illuminating gas—somehow accumulated in the attic and was probably ignited by the hot water tank in the attic and the damaging explosion and fire resulted—no one at home—gas company on the spot check revealed an open street service line.' "

It is clear and undisputed that the gas company had for many years undertaken and made tests and inspections of the gas service piping, house piping and appliances in connection with the furnishing and use by the residents of the city of Toledo of gas furnished by the defendant; that a test and inspection of the gas appliances, piping and venting connected with and being appurtenant to the premises of the plaintiffs was made by the defendant before gas was made available for use by the plaintiffs in their residence; that such inspection included the house service line or pipe extending from the main line of the defendant maintained in the street to the foundation and residence of the plaintiffs, a distance of 35 or 40 feet; and that such inspection and test was made by employees of the defendant on July 12, 1949.

It is clear from evidence in the record, including a part of the pipe as an exhibit and the fracture in same, that there was a break and opening in the gasline or pipe at a place in the pipe located from 18 inches to 3 feet from the foundation of the residence toward the street, and that gas would leak from such fracture, so found to be in the pipe following the explosion; and

it is also inferable from evidence in the record that gas, after leaking from such house service-line fracture, would probably pass, thereafter, through the aperture in the foundation through which the pipe extended and upward through the open space between the cinder cement block and the stone facing to the attic and there be brought into close proximity with the gas water heater being maintained in the attic.

We also find in the record an exhibit which is a pamphlet or book of ''regulations and instructions'' issued by defendant and which contains regulations and instructions for the guidance and use of employees of the defendant in the making of tests and inspections; that such regulations required that gas should not be made available for use in residences unless the hole or aperture in the foundation through which the gas pipe passed was sealed shut and closed, so that gas which might leak from the line extending from the residence could not pass into the house; that mercury gauges were provided for use in making tests and inspections, and certain time limits were specified and required for making such tests; and that tests and inspections were to be made within certain time periods after being requested and required in accord with procedure prescribed by the defendant in its regulations and instructions.

It is not disputed that the inspection of the appliances, gas service piping and house piping connected with the residence of the plaintiffs was delayed for 7 or 8 days following the date requested and upon which the inspection according to the instructions of the defendant was required to be made; that when such inspection was made the house service-line had been covered; and that by reason thereof no visual inspection of that line or the aperture in the foundation through which the pipe passed into the residence was made, although such visual observation, it is undisputed, could and would have been made if the inspection had not been delayed and had been made upon the date as requested and required by the regulations of the defendant.

It is considered that a part of the testimony of the subcontractor who had charge of and supervised all the plumbing work which was performed in the construction of the residence of the plaintiffs is pertinent at this point in a consideration of the evi-

dence contained in the record, as being most favorable to the plaintiffs:

"Q. Do you then cover the trench, Mr. Keim? A. Did I what, sir?

"Q. Did you then cover the trench? A. No, I didn't.

"Q. That is, the trench in which the line lay? A. I didn't cover it, or my workmen.

"Q. Do you know who did? A. Carl Ruch's workmen covered the trench.

"Q. Do you know when they covered it? A. No, I don't, but it was two days after I completed my job there on the installation of the service.

"Q. That would be two days after you requested the inspection and test? A. Yes.

"Q. That they filled the trench? A. Yes.

"Q. But you don't know whether in the interim period an inspection of the test had been made or not? A. No, I don't know.

"* * *

"Q. I believe you testified previously about the break in the service line. Does this appear to be—handing you what has been marked plaintiff's exhibit No. 1, does that appear to be the pipe in which the break occurred? A. I don't know if it is the pipe; it looks like the pipe, sir.

"Q. Does that look like it? A. That looks like the pipe we use for service lines.

"Q. You don't know if it was this particular pipe or not? A. No, sir.

"Q. Was the service pipe cut off in that one? A. No, it was fully attached when I saw it.

"Q. You didn't see it after it was cut off? A. No.

"Q. When you saw the service line, was it open in the same manner? A. It was.

"Q. Did you observe the coupling on that? A. It was.

"Q. Did you observe the coupling on that? A. That's right, it is a—

"Q. Did the service line that you observed while still in the ground, appear to be broken like that one is? A. That's right, it appeared to be broken the same as this.

"Q. Now, Mr. Keim, do you have an opinion as to whether gas would leak from the hole in the service line which you observed? A. Yes, I have that opinion, sir.

"Q. What is your opinion? A. Well, maybe I misunderstood. But it would leak from that hole in the service line.

"Q. Do you have an opinion as to whether the gas leaking from that hole in the service line might find its way through a hole in the foundation of the house which is only two or three feet from the break in the line? A. It is very possible, yes.

"Q. Is that your opinion? A. Yes.

"Q. Is it your opinion it could find its way through there? A. It could find its way through.

"Q. And finding its way through the foundation, do you have an opinion as to whether it could have found its way into the house? A. Yes, it could.

"Q. It is your opinion that it could? A. That's right."

It is also significant in our view that there is undisputed evidence in the record that the aperture or hole in the foundation of the residence had not been closed or "sealed" as required by the regulations of the defendant, and that if the inspection had been made at the time requested and as "required," before the trench had been filled and the service pipe and hole in the foundation were covered with earth, the defendant's employee in authority would not have made gas available for use in the residence until the hole in the foundation through which the service pipe passed had been closed and "sealed," so that any gas which might have leaked from the service line could not pass through such hole into the residence.

It is shown further by evidence in the record that in the making of the tests and inspection prior to making gas available for use in the residence of the plaintiffs the employees who made such tests and inspection and who were responsible for the result of same failed to follow or comply with the instructions and regulations of the defendant, in that in testing the service line extending from the street to the residence the employees of the defendant tested that line by holding the mercury at a certain required level for a period of only three minutes, whereas the specific instructions of the defendant were that such test was required to be made by the mercury in such gauge being held

at the prescribed level for a period of 20 minutes instead of for the much lesser period of three minutes as was admittedly the manner in which the test was made by the defendant's employees.

We are not unaware of, or have we failed to note, the evidence contained in the record favorable to the defendant, which includes in part that the explosion and resulting fire did not occur until after the lapse of 70 days from the date gas was made available for use by the plaintiffs in their residence, that gas was used by the plaintiffs during that time without an explosion having occurred, and that tests made by defendant indicated that there were no defects or breaches in the service or house piping which could have been the cause of the explosion and resulting damage, as well as other evidence which tended to absolve the defendant from liability under the circumstances.

Nevertheless, it is the established rule of law, requiring no emphasis or citation of authorities, that we are required to give consideration to the evidence most favorable to the plaintiffs in reaching a conclusion in a determination of the appeal as presented by the record now before us.

The plaintiffs' assignments of error are as follows:

"1. The court erred in granting defendant's motion for a directed verdict.

"2. The court erred in overruling plaintiffs' motion for a new trial."

We, therefore, determine on the record before us that plaintiffs' assignments of error as quoted above are well taken and that the judgment of the Court of Common Pleas should be, and hereby is, reversed, and the cause is remanded to that court for a new trial.

We deem it unnecessary to enter upon a detailed consideration of the responsibility of the defendant under the circumstances shown to exist by the evidence in the record before us. However, we do find and determine that in undertaking to make an inspection the defendant thereby became responsible and was required to exercise ordinary care in making and completing the inspection and was liable for acts or omissions which would amount to negligence proximately resulting in damage to the plaintiffs. *Hamden Lodge* v. *Ohio Fuel Gas Co.*, 127 Ohio St., 469, 189 N. E., 246.

We consider the fourth paragraph of the syllabus in the *Hamden Lodge case* applicable in a determination of this appeal:

"4. Where from the evidence reasonable minds may reach different conclusions upon any question of fact, such question of fact is for the jury. The test is not whether the trial judge would set aside a verdict on the weight of the evidence."

It is considered also, in view of the evidence in the record now before us, as stated above, that the defendant became responsible and was required to exercise reasonable and ordinary care in making the inspection which it undertook to make in reference to the gas service piping, house piping and appliances appurtenant to and connected with the residence and premises of the plaintiffs, and that, therefore, the fourth and fifth paragraphs of the syllabus in *Northwestern Ohio Natural Gas Co.* v. *First Congregational Church of Toledo,* 126 Ohio St., 140, 184 N. E., 512, are applicable and pertinent, as follows:

"4. By reason of the highly dangerous character of gas and its tendency to escape, a gas company must use a degree of care, to prevent the escape of gas from its pipes, commensurate with the danger, and if it fails to exercise this degree of care and injury results therefrom, the company is liable, provided the person suffering the injury either in person or in property is free from contributory negligence; and whether, under all the circumstances of a case, a defendant gas company has used such degree of care is a question to be submitted to the jury, under proper instructions, if there be evidence in the record tending to show every essential element necessary to create a liability or evidence of facts from which a reasonable inference might be drawn to support such elements necessary to create such liability.

"5. In an action for damages against a natural gas company on account of destruction of plaintiff's property by an explosion of gas which is claimed to have percolated into the basement of plaintiff's property after escaping from leaking pipes, and where plaintiff's suit is predicated upon the claim that the gas company had notice that there was gas leaking into the basement of plaintiff's building prior to the explosion, which notice the company denies, such issue as to notice should be submitted to the jury, if the record contain evidence tending to show actual

knowledge or knowledge of facts from which notice might reasonably be inferred."

See, also, *Biery, Admx.,* v. *Pennsylvania Rd. Co.,* 156 Ohio St., 75, 99 N. E. (2d), 895; *Wilkeson, Admr.,* v. *Erskine & Son, Inc.,* 145 Ohio St., 218, 61 N. E. (2d), 201; *Baldridge* v. *Wright Gas Co., Inc.,* 154 Ohio St., 452, 96 N. E. (2d), 300; 39 Ohio Jurisprudence, Trial, 791 *et seq.,* Sections 179, 180, 181, 182, 183.

The judgment of the Court of Common Pleas is reversed and the cause is remanded to that court for a new trial.

*Judgment reversed and cause remanded.*

CONN and FESS, JJ., concur.